**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| ELIZABETH GONZALEZ,<br><br>                              Plaintiff,<br><br>       v.<br><br>CHARLOTTE A. BURROWS, Chair of the U.S. Equal Employment Opportunity Commission,<br><br>                              Defendant. | No. 1:20-cv-02111<br><br>Judge Matthew F. Kennelly |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS AND STATEMENT OF ADDITIONAL MATERIAL FACTS

Plaintiff Elizabeth Gonzalez ("Gonzalez") submits this response to Defendant's Local Rule 56.1 Statement of Material Facts (ECF Nos. 87, 89) and Rule 56.1 Statement of Additional Material Facts.

### Jurisdiction and Venue

1.      This is an action for discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Rehabilitation Act. Answer, Dkt. 43 ¶ 1.

**RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

2.      Venue is proper in this district because the action arises out of events that occurred in the Northern District of Illinois. Answer, Dkt. 43 ¶ 3.

Parties

**RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

3.      Plaintiff Elizabeth Gonzalez is a former employee of the EEOC. Answer, Dkt. 43

¶ 4. Gonzalez Dep. 33:2-16, Ex. N; Offer of employment letter, Ex. A. Her national origin is Hispanic and her sex is female. Gonzalez Dep. 43:10-11, Ex. N. She states that she is disabled and engaged in prior protected activity. Gonzalez Dep. 43:14-19, Ex. N.

**RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

4.      Defendant Charlotte A. Burrows is the Chair of the U.S. Equal Employment Opportunity Commission. Answer, Dkt. 43 ¶ 5.

**RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

## Gonzalez's Employment at the EEOC Chicago District Office

5.      Gonzalez began working for the EEOC on December 1, 2014 at the Chicago District Office as an Information Intake Representative (IIR) on December 1, 2014. Answer, Dkt. 43 ¶ 22; Offer of Employment Letter, Ex. A.

**RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

6.      Gonzalez's employment was subject to a year-long probationary trial period. Answer, Dkt. 43 ¶ 23; Offer of Employment Letter, Ex. A. Her probationary period ended on November 30, 2015. Offer of Employment Letter, Ex. A.

**RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

7.      As an IIR, Gonzalez job duties were to answer calls from members of the public placed to the EEOC's hotline to get more information about filing EEOC claims and to answer general inquiries. Gonzalez Dep. 34:1-7, Ex. N; DeWolf Decl. ¶ 3, Ex. B; Answer, Dkt. 43 ¶ 24. Gonzalez was hired as a Spanish-speaking IIR specifically for callers that requested to speak in Spanish. Gonzalez Dep. 24:2-10, 42:4-11, Ex. N; Answer, Dkt. 43 ¶ 4.

**RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

2

8.      The Information Intake Group (IIG) is the Agency's "front line" (i.e., first point of contact) for members of the public who use the Agency's toll-free number and e-mail address to contact the Agency with general inquiries. DeWolf Decl ¶¶ 1-2, Ex. B. The IIG receives approximately 500,000 to 600,000 phone calls and 25,000 emails annually. DeWolf Decl ¶ 2, Ex. B. Using an extensive knowledge database, Intake Information Representatives (IIRs) respond to these calls and e-mails. DeWolf Decl ¶ 2, Ex. B.

**RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

9.      IIRs are primarily responsible for obtaining information from individual callers to determine if the harm claimed by the individual is within the Agency's jurisdiction. DeWolf Decl. ¶ 3, Ex. B. If it is, the IIR provides the caller with an Intake Questionnaire and instructions regarding how to submit the form to the appropriate Agency field office for processing. DeWolf Decl ¶ 3, Ex. B. If the alleged harm is not within the Agency's jurisdiction, the IIR tries to provide the caller with information regarding other possible sources of assistance. DeWolf Decl ¶ 3, Ex. B. The IIGs goal is to answer as many calls and emails and quickly as possible. DeWolf Decl ¶ 3, Ex. B.

**RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

10.      Her first-line supervisor was Enforcement Supervisor Tyrone Irvin, her second-line supervisor was Enforcement Manager Patricia Jaramillo, and the decisionmaker regarding her termination was the District Director, Julianne Bowman. Answer, Dkt. 43 ¶ 26, 32; Gonzalez Dep. 182:6-9, Ex. N; Jaramillo Dep. 71:20-72:2, Ex. O.

**RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

11.      Julie Bowman is the District Director of the Chicago Office of the EEOC. Bowman Aff. 1:7-17, Ex. C. She was the Deputy Director from 1999 to 2015, until she was

3

promoted to the District Director. Bowman Aff. 1:7-17, Ex. C. Her responsibilities include oversight of the EEOC's Chicago District which covers a six state area (Illinois, Wisconsin, Iowa, Minnesota, and North and South Dakota). Bowman Aff. 1:7-17, Ex. C. This includes private sector enforcement, federal sector hearings, ADR, state and local enforcement, and administrative functions for the Chicago, Milwaukee, and Minneapolis offices. Bowman Aff. 1:7-17, Ex. C.

**RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

### Probationary Period

12.     "The probationary period is an important management tool to evaluate the conduct and performance of an employee and should be treated as the last step in the hiring process." Removing Federal Employees and Taking Other Disciplinary Action or Performance Actions and Removing Federal Employees, at 3, https://www.opm.gov/policy-data-oversight/employee- relations/reference-materials/managing-federal-employees-performance-issues-or-misconduct.pdf (last accessed, April 22, 2022), attached as Ex. AA. "Employees may be terminated from employment during the probationary period for preemployment reasons or for unacceptable performance or conduct." *Id.*

**RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

### EEOC Leave Policies

13.     Leave Without Pay is a Leave without pay is a temporary, non-pay status and absence from duty that may be granted upon an employee's request. EEOC's Leave Policy, Appendix F-11, Ex. D.

**RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

14.     Use of Leave Without Pay is restricted for all employees. EEOC's Leave Policy, F-4a, Ex. D. The employee must get permission to use LWOP from their supervisors for up to 10 days. EEOC's Leave Policy, F-4a, Ex. D. After they have surpassed 10 days of LWOP, further LWOP requires the approval of the appropriate Office or District Director for up to 30 days. EEOC's Leave Policy, F-4a, Ex. D. Any LWOP for more than 30 days requires approval from the Chief Human Capital Officer to allow any further use of LWOP by any employee. EEOC's Leave Policy, F-4a, Ex. D.

**RESPONSE:** Genuine dispute as to material fact for summary judgment purposes. Mr. Irvin approved all of Gonzalez's requests for leave without pay as her supervisor. Irvin Dep. 85:24–87:19, attached as Ex. A. Mr. Irvin even approved Gonzalez's leave in order *not* to alert or cause disciplinary action against Gonzalez. *Id.* at 87:13–19.

### Gonzalez's Absences

15.     Gonzalez used 252.30 hours leave without pay (LWOP) beginning in March of 2015 through November of 2015. Leave Documents, Ex. E; Termination Letter, Ex. F. She also used 96 hours of annual leave and 95.45 hours of sick leave, including advanced annual and advanced sick leave. Leave Documents, Ex. E; Termination Letter, Ex. F.

**RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

16.     In pay period 19 of this year, she used 62 hours of LWOP, which was more than 75% of her scheduled work time for that pay period. Leave Documents, Ex. G; Termination Letter, Ex. F.

**RESPONSE:** Genuine dispute as to material fact for summary judgment purposes. Termination Letter, ECF No. 87-6 ("more than 50% of your time").

5

17.     Elizabeth Gonzalez's leave documentation from her employment with the EEOC is attached as Exhibit E which shows all the days Gonzalez was absent.

**RESPONSE:**  No genuine dispute as to material fact for summary judgment purposes.

18.     Gonzalez testified that she has no reason to dispute the records related to her leave and absences and that she is unaware of any inaccuracies. Gonzalez Dep. 180:15-181:13, Ex. N ("Q. At the time of your -- these meetings in November 2015, was -- were you aware of any inaccuracy in your documentation of your leave? A. No. Q. Were you aware of any inaccuracy related to the documentation of the absences you had at work? A. Could you repeat that? Q. Were you aware as of November 2015 of any inaccuracy in how they were recording your absences at work? A. No, I was not aware. Q. Do you have any reason to believe that there is any inaccuracy in this document marked Exhibit 12? A. I don't know. Q. Sorry, was that I don't know or I don't, no? A. I don't know if there are any inaccuracies. Q. So as you sit here today, you don't know of any inaccuracies in this Exhibit 12? A. Correct.").

**RESPONSE:**  No genuine dispute as to material fact for summary judgment purposes.

19.     Gonzalez testified that she used all of her annual and sick leave and multiple days of LWOP during her probationary period. Gonzalez Dep. 225:18-226:6, Ex. N.

**RESPONSE:**  No genuine dispute as to material fact for summary judgment purposes.

20.     Gonzalez testified that she does not know if she performed at a satisfactory level in regards to her attendance. Gonzalez Dep. 188:18-21, Ex. N ("Q. Do you think you performed at a satisfactory level in regards to attendance? [. . .] A. I don't know.").

**RESPONSE:**  Genuine dispute as to material fact for summary judgment purposes. Gonzalez Dep. 188:23–189:8 ("Q. In your own opinion do you think you performed at a satisfactory level in regards to attendance? A. Yes. Q. And what is that based on? A. My

6

performance. I was able to perform the essential functions of my position as an information

intake representative during the time that I was working physically at the EEOC office. I met

expectations.").

21. Attendance is considered by the agency to be a conduct issue rather than a

performance issue. Irvin Dep. 32:13-24, Ex. P.

**RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

22. From February to May of 2015, her second through sixth months of work,

Gonzalez was absent on multiple days and began taking Leave Without Pay (LWOP). Gonzalez

Pay Period Leave Documentation, Ex. E. Gonzalez's first-line supervisor, Tyrone Irvin, observed

that Gonzalez was frequently taking leave without pay ("LWOP"). Irvin Aff. 2:45-46, Ex. H.

**RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

23. In the summer of 2015, Irvin reached out the Director Bowman for direction on

how to handle Gonzalez's use of LWOP. Irvin Aff. 2:45-46, Ex. H; Bowman Aff. 2:54-67, Ex.

C; May 28, 2015 Email, Ex. J. In the summer of 2015, Director Bowman and Irvin had a series

of conversations regarding Gonzalez's attendance. Bowman Aff. 2:54-67, Ex. C.

**RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

24. Specifically, on May 28, 2015, Irvin sent an email to Director Bowman with the

subject line "IIR Elizabeth Gonzalez," stating: "She has requested LWOP all week. Is there a

conversation I need to have concerning the use of LWOP or are we concerned at all with its use."

May 28, 2015 Email, Ex. J. On May 30, 2015, Director Bowman responded, stating: "Yes we are

concerned about its use. I think the conversation needs to be around finding out why she needed

it and what's the future look like." May 30, 2015 Email Chain, Ex. K. The same day, Irvin

responded, stating: "I am planning to have a more in depth conversation with her on Monday.

she disclosed the gist of what she is going through in a text. I can talk to you more about it when you return." May 30, 2015 Email Chain, Ex. K.

**RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

25.     Tyrone met with Gonzalez two times over the summer of 2015 to discuss her attendance issues. Irvin Aff. 2:57-62, 4:147-59, Ex. H; Irvin July 8, 2015 Notes, Ex. L; Irvin Aug 18, 2015 Notes, Ex. M; see also Gonzalez Dep. 120:3-9, 137:4-24, Ex. N.

**RESPONSE:** Genuine dispute as to material fact for summary judgment purposes. Gonzalez Dep. 119:13–138:5 (testifying about her disabilities in conversations and number of conversations over the summer of 2015), attached as Ex. C.

26.     In July of 2015, Irvin spoke with Gonzalez to address her attendance, and Gonzalez shared that she was experiencing a domestic violence situation with her son at home. Irvin Aff. 2:53-62, Ex. H; Irvin July 8, 2015 Notes, Ex. L; Gonzalez Dep. 119:13-22-121:16, Ex. N. Irvin suggested that Gonzalez contact the EEOC's Employee Assistance Program ("EAP"), 3-1-1, or the Disability Program Manager ("DPM") for assistance. Irvin Aff. 2:53-62, Ex. H; Irvin July 8, 2015 Notes, Ex. L.

**RESPONSE:** Genuine dispute as to material fact for summary judgment purposes. Gonzalez Dep. 119:13–138:5 (testifying about her disabilities in June, not July), attached as Ex. C.

27.     Irvin conveyed to Bowman that there was a family situation that was causing Gonzalez to be absent. Bowman Aff. 2:54-67, Ex. C. Tyrone told Bowman about his conversation with Gonzalez and the resources he had provided, including the EAP and the ADA coordinator. Bowman Aff. 2:54-67, Ex. C.

**RESPONSE:** Genuine dispute as to material fact for summary judgment purposes. Gonzalez Dep. 119:13–138:5 (testifying about her disabilities in conversation).

28.     In August, Irvin had another conversation with Gonzalez about her attendance and where he recommended that she attend an EAP meeting because an EAP representative would be in the office the following day. Irvin Aff. 4:158-64, Ex. H; Irvin Aug 18, 2015 Notes, Ex. M; Gonzalez Dep 137:19-24, Ex. N ("19 Q. Did he inform you about a EAP training that was scheduled for August 19 in the morning? A. He did discuss that. Q. What did he tell you about it? A. He suggested that I attend the training, the session.").

**RESPONSE:** Genuine dispute as to material fact for summary judgment purposes. Gonzalez Dep. 119:13–138:5 (testifying about disabilities in August conversation), attached as Ex. C.

29.     Irvin took handwritten notes of his in person meetings with Gonzalez. Irvin July 8, 2015 Notes, Ex. L; Irvin Aug 18, 2015 Notes, Ex. M; Irvin Aff. 4:166-69, Ex. H; Irvin Dep. 48:17- 49:2, 58:5-13, Ex. P. The notes were written the same day the meeting occurred. Irvin Dep. 48:17- 49:2, 58:5-13, Ex. P.

**RESPONSE:** Genuine dispute as to material fact for summary judgment purposes. Gonzalez Dep. 119:13–138:5 (testifying about June, not July), attached as Ex. C.

30.     On November 6, 2015, Irvin wrote an email to Director Bowman and Jaramillo with the subject line "Meeting concerning IIR Elizabeth Gonzalez," stating that: "In the past three weeks she has improved her attendance as it pertains to LWOP, but she arrives about 15 minutes late a day. She has not taken LWOP since 10/14/2015. Prior to that it was at least three days a week sometimes more. I have not had a conversation with Elizabeth since probably August about the taking of LWOP. I just wanted to update you to so that we can decide see if

9

this latest improvement is acceptable or if we should still be considering other options. Are you available Monday or Tuesday to discuss?" Nov 6, 2015 Email, Ex. R.

      **RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

      31.     Sometime over the next few weeks in November, Bowman, Jaramillo, and Irvin met to discuss Gonzalez's attendance and whether to retain her or terminate her at the end of her probationary period. Bowman Aff. 4:135-37, Ex. C; Jaramillo Aff. 3:103-06, Ex. I; Irvin Aff. 3:127-131, Ex. H.

      **RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

      32.     Director Bowman considered providing Gonzalez with additional time to demonstrate improvement in her attendance by extending her probationary period. Bowman Aff. 5:213-6:221, Ex. C. Director Bowman emailed Disability Program Manager ("DPM") Rodney Yelder, and the Office of the Chief Human Capital Officer ("OCHCO"), Steve Schuster, to determine whether or not the EEOC could extend Gonzalez's probationary period. Nov 16, 2015 Email to Schuster, Ex. S. On November 16, 2015, Director Julie Bowman wrote Rodney Yelder and Stephen Schuster and email with the subject line "Need some help and advice…" Nov 16, 2015 Email to Schuster, Ex. S. The email stated: "We have a probationary employee whose year is up on December 1st. She is a good employee but due to some very serious personnel issues and possibly ADA issues, her attendance began to seriously falter about half way through her probationary period. We have discussed her attendance and the possible consequences with her more than once. It got better for a while and then took a downward turn. Management is talking to her again tomorrow about her circumstances and what we might do to assist. I am wondering a couple of things. First, is there any way to suggest that an ADA accommodation be that her probationary period be extended (assuming that was a reasonable accommodation that made

sense)? When she is in the office, she does good work, and we would like to try some other avenues to see if she can get her attendance under control. If we could get an extension, we might want to consider moving her into another position temporarily to see if that helped. We might also want to consider offering her part time employment if that would be of assistance. If you have any thoughts or advice, please let me know as soon as you can as her last" Nov 16, 2015 Email to Schuster, Ex. S.

**RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

33.    Sometime in early November, Bowman asked Jaramillo to meet with Gonzalez to see if there was anything that could be done to improve her attendance. Bowman Aff. 4:133-42, Ex C. Director Bowman wanted to get the perspective of a second management official of both why Gonzalez was taking so much leave and the likelihood that Gonzalez's attendance would improve.

**RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

34.    On November 17, 2015, Jaramillo and Gonzalez met in Jaramillo's office to discuss Gonzalez's attendance. Jaramillo Dep. 27:8-29:18, Ex. O; Gonzalez Dep. 146:21-149:24; 2015- 11-17 Email, Ex. N.

**RESPONSE:** Genuine dispute as to material fact for summary judgment purposes. Gonzalez Dep. 146:24–158:21 (testifying about her disabilities and requesting accommodations in November 17, 2015 conversation), attached as Ex. C.

35.    Gonzalez testified that during the Nov 17, 2015 meeting, Gonzalez told Jaramillo that she "did not have control over her disabilities" after being asked whether she could improve her attendance. Gonzalez Dep. 155:10-13, Ex. N ("Q. Did you -- did you ever tell her that your attendance would improve? A. I told her that I don't have control over my disabilities.")

11

**RESPONSE:** Genuine dispute as to material fact for summary judgment purposes. Gonzalez Dep. 146:24–158:21 (testifying about her disabilities and requesting accommodations in November 17, 2015 conversation), attached as Ex. C.

36.     On November 17, 2015, that same day, Patricia Jaramillo sent an email summarizing her meeting with Gonzalez to Director Julie Bowman and Tyrone Irvin, stating: "Spoke to Elizabeth this afternoon. It was not very productive. I told her she was a probationary employee and we were concerned with her attendance. She was very surprised by the conversation and did not see it coming. She did say that Tyrone may have had a previous conversation with her, but she doesn't remember. She asked me if she was going to be fired. I said we had not made that decision and I was talking to her so (sic) see what was going on with her attendance and possible solutions or alternatives. She said she did not know. She doesn't want to be part time. Her job is not stressing her out. She did say that she has been out due to health reasons and issues with her son. She volunteered that she gets migraines headaches and being on the phone all day doesn1 help her migraines. I asked her if there was anything we could do about that and she said that she has worked it out with Ken to turn the lights down that helps. I ask her if she had the information for the ADA coordinator and told her that either I or Tyrone would give it to her. She asked if she could work from home when she gets the migraines. I asked her how with that work with her son in her house and her having the migraines. This is when she volunteered that her son had moved out two or two and half weeks ago. If she has migraines how would working from home help her." Nov 17, 2015 Email, Ex. T.

**RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

37.     Tyrone and Jaramillo met on November 18, 2015, to discuss their recommendation of whether to retain or terminate Gonzalez at the end of her probationary

12

period. Nov 18, 2015 Email, Ex. U. They concluded that their recommendation was to terminate Gonzalez due to her excessive absences. Nov 18, 2015 Email, Ex. U.

**RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

38.     On November 18, 2015, Irvine sent an email to Director Bowman and Jaramillo, stating: "Patricia and I spoke today concerning Elizabeth. After a review of all the time she has taken off and in light of Patricia's conversation with her, we have concurred that she should be dismissed. I reviewed her time in QT and she has taken a total of 241 hours of LWOP beginning May 27, 91.45 hours S/L beginning April 6th and 92 hours A/L beginning April 13. I will work on the document first thing in the morning and have it to you and Patricia for review." Nov 18, 2015 Email, Ex. U.

**RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

39.     Director Bowman was advised that the EEOC could not extend Gonzalez's probationary period because it violated OPM regulations. Bowman Aff. 5:213-6:221, Ex. C.

**RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

### Termination

40.     After consulting with Irvin and Jaramillo and reviewing Gonzalez's attendance record, Director Bowman decided to remove Gonzalez from the federal service due to her excessive absences over the 12-month period and because she had no reason to believe Gonzalez's attendance would improve. Bowman Aff. 4:149-59, Ex. C.

**RESPONSE:** Genuine dispute as to material fact for summary judgment purposes. Irvin Dep. 80:2–81:8, attached as Ex. A (testifying that Gonzalez's supervisor, Mr. Irvin, and his reviewing manager, Ms. Jaramillo, both reported that Gonzalez was meeting expectations in her last performance review as of November 23, 2015), Irvin Dep. Ex. 8 (same), attached as Ex. B;

Irvin Dep. 85:24–87:19 (testifying that Gonzalez's supervisor, Mr. Irvin, approved all of

Gonzalez's requests for leave without pay), attached as Ex. A.

 41. Gonzalez's termination letter stated the following:

This action is being taken because you failed to maintain a regular work schedule in your position. Specifically, you have excessive unscheduled absences from work. This action is in accordance with 5 CPR 315.804.

Your employment as an IIR with the Commission began on December I. 2014. Your attendance was acceptable until approximately May of 2015. Since that time. however, you have frequently been absent from work. Specifically, you have used 252.30 hours leave without pay (LWOP) beginning in March of 2015 (Pay period 8) through November of 2015 (Pay period 25). You have also used 96.00 hours of annual leave and 95.45 hours of sick leave to cover your absences. In each pay period since March of 2015, you have used some combination of annual leave, sick leave and/or LWOP to cover your absences. In pay period 19 of this year. you used 62 hours of LWOP, which was more than 50% of your time for that pay period. In July of 2015 and again in August of 2015, I had conversations with you pertaining to your frequent absences from work and the possibility that you could be discharged as a probationary employee if your attendance did not improve. During those conversations, you informed me that your absences were caused by stress from events in your private life. I directed you to EAP and the ADA Reasonable Accommodation Coordinator in Headquarters in an attempt lo alleviate stress and improve your attendance. I have not been contacted by either program since our last discussion. The Enforcement Manager, Patricia Jaramillo, had a conversation with you in November of 2015 concerning your attendance issues. According to Ms. Jaramillo, the solutions discussed were not feasible, nor did you indicate you would attempt to improve on your attendance at work.

I have counseled you on various occasions on the necessity for you to improve your attendance at work. Despite attempts to get you to improve your attendance, you continued to be absent from work. Your absences have negatively impacted the operations of the office. There are only three (3) other IIRs and they have had to assume your duties in addition to their regular responsibilities when you are absent.

Termination Letter, Ex. F.

 **RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

 42. Right before her termination meeting, Gonzalez sent an email requesting

accommodations to management and various other personnel. Nov 25, 2015 Email, W.

 **RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

43.     On November 25, 2015, at the 1:30 p.m. meeting, Gonzalez was informed that the agency had decided to terminate her employment effective November 30, 2015. She was provided with a termination letter that explained the reasons for her termination. Termination Letter, Ex. F. During the meeting, Gonzalez asked if she could resign, and Jaramillo accepted her resignation. Jaramillo Aff. 4:158-63, Ex. I. The EEOC offered for her to work until November 30, 2015, but Gonzalez preferred to resign effective immediately on November 25, 2015. Jaramillo Aff. 4:158- 63, Ex. I.

**RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

### Requests for Accommodations

44.     All requests for reasonable accommodations are to be requested through the Disability Program Manager who is located in headquarters in DC. Bowman Aff. 3:108-14, Ex. C; Jaramillo Aff. 2:86-87, Ex. I ("Q. How are requests for reasonable accommodation generally handled by your office? A. Employees are told to contact the DPM in HQ."). At the time, the Disability Program Manager was Rodney Yelder. Bowman Aff. 3:108-14, Ex. C.

**RESPONSE:** Genuine dispute as to material fact for summary judgment purposes. *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 693 (7th Cir. 1998) ("Under the ADA, an employee begins the accommodation 'process' by informing his *employer of his disability* [i.e., not a specific person]; at that point, an employer's 'liability is triggered for failure to provide accommodations.'").

45.     On November 17, 2015, during the meeting between Jaramillo and Gonzalez, Gonzalez requested to telework from home as an accommodation. Gonzalez Dep. 149:11-24, Ex. N; Nov 17, 2015 Email, Ex. T. Jaramillo directed Gonzalez to contact the Disability Program Manager. Nov 17, 2015 Email, Ex. T.

15

**RESPONSE:** Genuine dispute as to material fact for summary judgment purposes. Gonzalez Dep. 146:24–158:21 (testifying about Ms. Jaramillo's denial of accommodations in November 17, 2015 conversation), attached as Ex. C.

46.     During a subsequent meeting between Gonzalez, Kimberly Engram (her union representative) and Jaramillo, the issue of accommodation was raised again, and Jaramillo told Gonzalez to contact the ADA coordinator to request an accommodation. Gonzalez Dep 166:1-10, Ex. N ("Q. And you followed to say Miss Jaramillo then stated kind of the process to how to request a reasonable accommodation? A. She told me I could still contact an ADA coordinator to request a reasonable accommodation. Q. And you did that by reaching out to Dr. Rodney, not doctor, excuse me. You did that by reaching out to Mr. Rodney Yelder? A. Correct.").

**RESPONSE:** Genuine dispute as to material fact for summary judgment purposes. Gonzalez Dep. 167:21–23 (testifying about denial of accommodations in November 20, 2015 conversation), attached as Ex. C.

47.     The first time Gonzalez reached out the ADA coordinator, Rodney Yelder, was on November 20, 2015. Gonzalez Dep. 164:5-8, Ex. N ("Q. And that Exhibit 8, is that the first time you reached out to Mr. Rodney Yelder to request a reasonable accommodation? A. Yes.")

**RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

48.     On November 20, 2015, Gonzalez sent an email to Rodney Yelder, the ADA coordinator, to request a reasonable accommodation and to obtain the paperwork and directions on how to do so. Nov 20, 2015 Email Chain, Ex. V. Yelder responded on the same day, attaching the form and stating that "the process begins by completing the attached form and submitting it to me with medical support." Nov 20, 2015 Email Chain, Ex. V. On November 23, 2015, Gonzalez responded by asking a few questions about the medical support required. Nov 20, 2015

16

Email Chain, Ex. V. Yelder responded the same day, stating that the "doctor's statement should state your diagnosis and prognosis. He/she should also state the type of restrictions and accommodation you need." Nov 20, 2015 Email Chain, Ex. V.

**RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

49.     Gonzalez submitted the requested form. Request for Accommodation Form, Ex. X; Gonzalez Dep. 88:11-19, Ex. N.

**RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

50.     Gonzalez never submitted any supporting medical documentation to Yelder. Gonzalez Dep. 161:1-22, Ex. N.

**RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

### Gonzalez's Disabilities and Her Ability to Work

51.     Gonzalez testified and alleged that she had the following disabilities while she was employed by the EEOC: Major depression, suicidal ideation, anxiety, vertigo, and migraine headaches. Compl., Dkt. 43 ¶ 30; Gonzalez Dep. 43:16-44:24, Ex. N.

**RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

52.     Gonzalez testified that she had "no control" over her health and that she could not control her depression, vertigo, or suicidal ideation on certain days. Gonzalez Dep. 59:22-24, Ex. N.

**RESPONSE:** Genuine dispute as to material fact for summary judgment purposes. Gonzalez Dep. 59:22-24, attached as Ex. C ("Q. So when you say you could not control your depression, what do you mean by that? A. I have no control over my health.").

53.     Gonzalez testified that whether she could care for herself, shower, go to the bathroom, and get out of bed varied based on the day. Gonzalez Dep. 47:21-48:5, Ex. N ("Q.

Okay. During your employment at the EEOC were you able to care for yourself? By that I mean were you able to shower, go to the bathroom by yourself and independently? A. It varied on days. Q. Can you describe what you mean by that? A. On the days I couldn't control my depression or vertigo or my suicidal ideation, I was not able to get out of bed.").

**RESPONSE:** No genuine dispute as to quoted testimony for summary judgment purposes.

54.     Gonzalez testified that she was unable to do her daily tasks or work when she could not control her depression. Gonzalez Dep 59:22-60:8, Ex. N ("Q. So when you say you could not control your depression, what do you mean by that? A. I have no control over my health. Q. And so I guess what I'm saying is, when that is happening what happens to you when you can't control your depression? [. . .] A. I'm unable to do my daily tasks. Q. Does that include work? A. Yes.").

**RESPONSE:** No genuine dispute as to quoted testimony for summary judgment purposes.

55.     Gonzalez testified that she was unable to complete her daily tasks or work when she could not control her vertigo. Gonzalez Dep. 61:21-62:4, Ex. N ("Turning to vertigo, when you can't control your vertigo on a given day -- and I'm talking about the time frame from December 2014 to November 2015. When you can't control your vertigo on a given day, how does that affect you on that day? A. I'm unable to complete my daily tasks. Q. Does that include work? A. Yes.")

**RESPONSE:** No genuine dispute as to quoted testimony for summary judgment purposes.

56.     Gonzalez testified that she was unable to complete her daily tasks or work when she could not control her suicidal ideation. Gonzalez Dep. 61:10-17, Ex. N ("Q. When you cannot control your suicidal ideations, what -- how does that disability affect you on a day where you can't control that? A. I'm unable to complete my daily tasks. Q. And the answers that we just went through for depression, are those the same answers you would give for suicidal ideation? A. Yes.")

**RESPONSE:** No genuine dispute as to quoted testimony for summary judgment purposes.

57.     Gonzalez testified that she was not aware of any accommodation that would have allowed her to go to work and not use leave without pay during her probationary period. Gonzalez Dep. 66:19-67:24, Ex. N ("Q   Are you aware of any accommodation that would have allowed you to go to work and not use leave without pay during your probationary period? [. . .] A. I don't know.").

**RESPONSE:** No genuine dispute as to quoted testimony for summary judgment purposes.

58.     Gonzalez testified that she did not know if she could have done her scheduled hours at the EEOC without taking leave without pay even if she had an accommodation. Gonzalez Dep. 67:14-18, Ex. N ("Q. So as you sit here today you don't know if you could have done your scheduled hours at the EEOC without taking leave without pay even if you had an accommodation? A. Correct.").

**RESPONSE:** No genuine dispute as to quoted testimony for summary judgment purposes.

59.     Gonzalez testified that on days when she struggled to get out of bed, she was

unaware of an accommodation that could have helped her, Gonzalez Dep. 65:20-67:18, Ex. N:

Q. On the days while you're employed at the EEOC when you could not get out of bed or struggled to get out of bed, what could have helped you do that?

MR. LEE: Calls for speculation, expert opinion.

THE WITNESS:

A. I don't know.

BY MS. RAEDY:

Q. What, if anything, would have allowed you to come to work every day during your probationary period at the EEOC?

MR. LEE: Calls for speculation.

THE WITNESS:

A. I don't know.

BY MS. RAEDY:

Q. Are you aware of anything that would have allowed you to go to work and, let's say, not all the time, but 80 percent of the time?

MR. LEE: Same objection.

THE WITNESS:

A. I don't know.

BY MS. RAEDY:

Q. Are you aware of any accommodation that would have allowed you to go to work the -- let's say, go to work except -- actually, strike that. Are you aware of any accommodation that would have allowed you to go to work and not use leave without pay during your probationary period?

MR. LEE: Calls for speculation, incomplete hypothetical.

THE WITNESS:

A. I don't know.

BY MS. RAEDY:

Q. In your opinion could you have worked your scheduled hours without taking leave without pay with accommodation?

A. Could you repeat that, please?

Q. In your opinion could you have worked your scheduled hours at the EEOC without taking leave without pay with an accommodation?

MR. LEE: Calls for speculation, expert opinion, incomplete hypothetical.

BY MS. RAEDY:

Q. You may answer.

A. I don't know.

Q. So as you sit here today you don't know if you could have done your scheduled hours at the EEOC without taking leave without pay even if you had an accommodation?

A. Correct.

**RESPONSE:** No genuine dispute as to quoted testimony for summary judgment purposes.

60.     Gonzalez testified that she does not know if teleworking would have helped her perform her work. Gonzalez Dep 152:20-22, Ex. N ("Q. So as you sit here today you don't know how teleworking would have helped you? A. Correct.").

**RESPONSE:** Genuine dispute as to material fact for summary judgment purposes. Gonzalez Dep. 212:22–213:1, attached as Ex. C ("Q. Would you have been -- would you have been able to do your job if you had been teleworking the entire time from home? A. Yes.").

61.     Gonzalez testified that she had no trouble taking public transportation and commuting to work with her disabilities. Gonzalez Dep. 55:5-16, Ex. N ("Q. How did you get to work at the Chicago office? A. Public transportation. Q. And what train or bus did you take? A. I would sometimes take the 59th Street bus if it was coming. If it was not arriving, I would just walk to the train station, and then I would take the train station. Q. Did you have any trouble taking public transportation in any way that's related to your disabilities? A. No.").

21

**RESPONSE:** No genuine dispute as to quoted testimony for summary judgment purposes.

## Alleged Retaliation

62.     Gonzalez testified that she was never told and never overheard that either of her union representatives, Jose Romo or Kimberly Engram, told anyone in management (Bowman, Jaramillo, or Irvin) that Gonzalez had contacted a EEO counselor. Gonzalez Dep. 208:13-210:3, Ex. N.

**RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

63.     Harold Sneath, a Contract Investigator with ADC LTD NM, did a background investigation for Elizabeth Gonzalez who was at that time applying to Customs Border Protection. Sneath Decl. ¶¶ 1-2, Ex. Y. Although he went to the EEOC's office in Chicago and left his card at the front desk for Tyrone Irvin or Jose Romo, he never received a return call, nor received any information, positive or negative, about Elizabeth Gonzalez from Tyrone Irvin or Jose Romo. Sneath Decl. ¶ 4, Ex. Y. He also never received any other substantive information from any other EEOC employee about Elizabeth Gonzalez's employment at the EEOC. Sneath Decl. ¶ 5, Ex. Y.

**RESPONSE:** Genuine dispute as to material fact for summary judgment purposes. Sneath Report of Investigation ¶¶ 9–10, ECF No. 87-25 (stating he received information from EEOC employee about Elizabeth Gonzalez's employment at the EEOC); Gonzalez Dep. 201:15–205:18 (testifying that Mr. Sneath said "that she [Yolanda at EEOC] stated that I [Gonzalez] started as an intern at the EEOC"), attached as Ex. C.

**Impact of Absenteeism in the IIG Unit on the Agency**

64.     In his declaration as the Supervisor Program Analyst of the Information Intake

Group (IIG) where Gonzalez worked from 2014 to 2015, Patrick DeWolf stated:

> Attendance is critical for the IIG to perform well for the public. Due to our increasing
> volumes, we rely on IIR staff to be on duty at their approved shift days/times.
> Absenteeism greatly impacts this small group as we do not have a surplus of staff to use
> for backfilling those employees who are absent. When a staff member is absent, it means
> that it is that many more calls that the IIG will not be able to answer for that day. It also
> means longer wait times for even those that are able to get through. For a member of the
> public who is unable to get through to the EEOC, it could possibly mean a delay in
> obtaining critical information regarding their situation or potential charge filing.
> Absenteeism has one of the largest impacts on the service the IIG provides to the public.
> As with many private sector contact center companies, the EEOCs IIG does not have the
> mass labor pool to quickly pull from to cover those employees with attendance issues.

DeWolf Decl. ¶ 4, Ex. B.

**RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

65.     Gonzalez testified that the call time for members of the public calling the 800

national hotline at times during the relevant time period exceeded over an hour. Gonzalez Dep

139:18-23, Ex. N ("Q. Do you remember anything else related to a hallway conversation with

Miss Julie Bowman? A. She mentioned they were going to hire more information intake

representatives. The call time for the individuals calling the 800 national hotline exceeded over

an hour.")

**RESPONSE:** No genuine dispute as to quoted testimony for summary judgment

purposes.

**Alleged Comparator Employees**

66.     Alison Hardiman was an IT Specialist for the EEOC. Bowman Dep. 61:10-11.

She was directly supervised by Director Bowman. Bowman Aff. 4:167-70, Ex. C. Hardiman had

been employed by the EEOC for many years and was not a probationary employee. Bowman

Aff. 5:191-92, Ex. C.

**RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

67. Gonzalez testified that Kenneth Jones took a "few days off" of work. Gonzalez Dep. 192:13–193:8, Ex. N. Gonzalez did not know whether Kenneth Jones used any LWOP during his probationary year. Gonzalez Dep. 192:13–193:8, Ex. N.

**RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

68. Georgia Brown was an IIR supervised by Tyrone Irvin. Irvin Aff. 5:182-85, Ex H. She was terminated during her probationary period due to attendance issues. Irvin Dep. 70:3-12, Ex. P.

**RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

69. In his declaration as the Supervisor Program Analyst of the Information Intake Group (IIG) where Gonzalez worked from 2014 to 2015, Patrick DeWolf stated:

> In October 2015 the Agency hired five IIRs---Ms. Christy Bailey, Mr. Nicholas Boren, Ms. Nydia Washington, Ms. Susan Brewer and Ms. Tamara Turner---using the Schedule "A" hiring authority. These five individuals were referred to us by the National Telecommuting Institute (NTI). These individuals were hired with the understanding that they would be able to telework from home 100% of the time as a reasonable accommodation. These five individuals reported directly to me. Although their specific disability was not shared with me, it was my understanding that they were related to severe mobility issues, thus the requirement to work 100% from home. This was the first time we had used NTI for such recruiting which was a different process than what we had used before through normal USAJOB posting.

DeWolf Decl. ¶ 5, Ex. B.

**RESPONSE:** No genuine dispute as to material fact for summary judgment purposes.

### Statement of Additional Material Facts

70. Gonzalez's supervisor, Tyrone Irvin, and his reviewing manager, Patricia Jaramillo, reported in her last performance review that Gonzalez was meeting expectations as of November 23, 2015. Irvin Dep. 80:2–81:8, attached as Ex. A, Irvin Dep. Ex. 8, attached as Ex. B.

**RESPONSE:**

71.     Mr. Irvin approved Gonzalez's requests for leave without pay as her supervisor. Irvin Dep. 85:24–87:19, attached as Ex. A; Gonzalez Dep. 122:10–126:2, attached as Ex. C.

**RESPONSE:**

72.     Mr. Irvin even approved Gonzalez's leave in order not to alert or cause disciplinary action against Gonzalez. Irvin Dep. 87:13–19, attached as Ex. A.

**RESPONSE:**

73.     The EEOC permitted Information Intake Representative (IIR) to telework from home. *Id.* at 10:9–13 ("they did hire some disabled employees to perform the job at home, yes"); *id.* at 11:15–19 ("Q. Would show up to work include if you were working from home, show up to do her job duties? A. Yes."); *id.* at 18:2–10 ("Q. Were you aware of anyone who performed Ms. Gonzalez's job function with any accommodation? A. That would have to be the employees who were working from home. Yeah, I'm pretty sure there were.").

**RESPONSE:**

74.     The EEOC gave accommodations to Kenneth Jones (African American) and Alison Hardiman (African American). Def.'s Opp'n 12–13; Gonzalez Dep. 190:8–198:5, attached as Ex. C.

**RESPONSE:**

75.     The EEOC gave accommodations to five other IIRs who had different disabilities than Gonzalez. Def.'s Opp'n 13; Irvin Dep. 10:9–13, attached as Ex. A

**RESPONSE:**

76.     Mr. Irvin explained that the duties essential to her IIR position could be performed from home: "Answering the phone, being able to relay information, being able to

read, write, type, answer phone calls, follow -- follow the information that is presented to her in the computer programs." *Id.* at 11:5–19.

**RESPONSE:**

77.     Gonzalez requested and testified she would have been able to do her job if she had been teleworking from home.  Gonzalez Dep. 212:16–213:7, attached as Ex. C.

**RESPONSE:**


Dated: June 1, 2022                              Respectfully submitted,

                                                 */s/ Brian O. Watson*
                                                 Brian O. Watson
                                                 RILEY SAFER HOLMES & CANCILA LLP
                                                 70 W. Madison Street, Suite 2900
                                                 Chicago, Illinois 60602
                                                 (312) 471-8700
                                                 bwatson@rshc-law.com
                                                 *Attorneys for Plaintiff Elizabeth Gonzalez*

4861-9272-5795, v. 1